UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
Case Number 5:24-cr-00250-M-RJ-1

| | |
|---|---|
| UNITED STATES OF AMERICA | * |
| | * |
| v. | * |
| | * SENTENCING MEMORANDUM AND |
| | * MOTION TO VARY |
| ISAIAH ANDERSON HARRISON | * |
| Defendant | * |

The Defendant, Isaiah Anderson Harrison, by and through undersigned counsel, respectfully submits this Memorandum in support of his position on sentencing. Pursuant to 18 U.S.C § 3553(a), *Gall v. United States*, 522 U.S. 38, 128 S. Ct. 586 (2007), *Kimbrough v. United States*, 552 U.S. 85, 128 S. Ct. 558 (2007), Your Honor will exercise discretion necessary to comply with the purposes of our criminal justice system, and based upon this Mr. Harrison asks the Court to vary below the advisory guideline range and sentence Mr. Harrison without enhancements or in the alternative a sentence of 36 months reflecting a consideration of the offense Mr. Harrison took responsibility for. When Your Honor imposes judgment upon Mr. Harrison, we ask for compassion and a fair sentence for the non-violent crimes committed.

FACTUAL BACKGROUND

Isaiah Anderson Harrison was born on Tuesday, April 9, 1991, in Brooklyn, New York, to the late Leroy Anderson, Jr., and the late Marguerite Harrison Anderson. Mr. Anderson was reportedly a United States Army veteran who served as a school bus driver before passing away from unspecified health issues on April 11, 1993. Mrs. Anderson worked as a security guard before passing away from COVID-19-related health issues on April 4, 2020. The defendant advised that he was the youngest of his siblings. Mr. Harrison's identified maternal half-siblings are Shawana

Harrison, 45, and Khalilah Harrison, 47, both residing in Brooklyn, and Emanuel Harrison, 51, of Roselle, New Jersey. According to the defendant, one of his paternal half-brothers, Derrick (LNU), is deceased, and he does not know any information regarding his second paternal half-brother.

Harrison maintains strong relationships with his maternal siblings and various nieces and nephews and is an extraordinarily supportive uncle to them. The Court can find character letters written by Tyree Wortham and Tanah Wortham, his nephew and niece, respectively. [Exhibit #1 – Attached Character letters]. Each has nothing but positive words of love and support for Mr. Harrison, as he has unconditionally loved and supported them as well. Whether it is celebrating their graduations with them or taking them on surprise trips to Disney World or to swim with dolphins in Miami, Mr. Harrison undoubtedly has a generous heart that the Presentence Investigation Report could never and would never encapsulate. [Exhibit #2 – Attached Family Photos]. While he has a supportive family, he is eager to return to society to continue giving support to other family members ready for him to return home.

Mr. Harrison's efforts to support his family primarily come from his upbringing of instability and poverty. Mr. Harrison grew up in Brooklyn, where his mother and late maternal grandmother, Viola Harrison, raised him. His mother faced financial difficulties, and although they were never evicted, some household utilities were disconnected due to late payments. While his mother worked hard to provide for herself and her son, Mr. Harrison's basic needs were met most of the time through social services and financial assistance, including free school lunches, food stamps, and Medicaid.

On top of the financial instability, Mr. Harrison witnessed alcoholism impact his mother and lead to varying degrees of instability and abusive relationships. Mr. Harrison's mother was in a relationship with an individual whom, to this day, Mr. Harrison only knows as "Randy." Lasting

for several years, Randy abused alcohol and physically and mentally abused the defendant and his mother. This toxic relationship even resulted in an incident where law enforcement was called to remove Randy from their home due to his behavior, but, as always, Randy returned. Mr. Harrison continues to suffer from the lingering mental abuse, and the physical signs of abuse are still visible on his body. During all of this, Mr. Harrison's grandmother was there to support him until her death removed a vital source of solace.

Losing his grandmother was a very traumatic time for Mr. Harrison, as he depended on her guidance and stability when he did not always receive this from his mother. Mr. Harrison reported having a history of depression during various periods in his life due to people close to him dying. Specifically, Mr. Harrison stated he struggled with periods of depression when his grandmother died. According to the defendant, he dealt with his mental health issues by self-medicating with the use of marijuana as a coping mechanism. Throughout all of this turmoil, Mr. Harrison set out to provide the support he lacked to his loved ones. After the passing of his grandmother, in pursuit of the stability he had lost, he moved from New York to Georgia and eventually to Florida. Like so many others, this led him to find camaraderie with the wrong people, who led him into crime.

Throughout the various character letters, this Court can see the role model and positive influence Mr. Harrison is capable of being. These efforts have not been hollow as he has worked hard to provide guidance, financial support, and positive encouragement to his younger family members. Mr. Harrison's nieces and nephews look up to him not only as an uncle but also as a father figure. Upon his release from incarceration, Mr. Harrison plans to reconnect with family and reside with his brother to restart his life on a better path. He wants to be the complete person his family sees him as and continue to support himself so he can support others as well.

Mr. Harrison does not present his story to this Court to circumvent the mistakes he has made, but rather to illustrate that he is and has always been much more than a name on a court document or an offender with an inmate number. Mr. Harrison asks this Court to consider his story, alongside the law, to arrive at a sentence which is sufficient but not more than necessary.

ARGUMENT

18 U.S.C. § 3553(a) lists factors that sentencing courts are to weigh in deciding a sentence to impose. *Rita v. United States*, 551 U.S. 338, 381, 127 S. Ct. 2456, 2482 (2007) (referencing *United States v. Booker*, 543 U.S. 220, 259-260, 125 S. Ct. 738, 764-765 (2005)). These factors guide a sentencing court in coming to a sentence that is ". . . sufficient, but not greater than necessary." 18 U.S.C. § 3553(a). In considering the nature of the offense, a factor before this Court, Mr. Harrison respectfully requests this Court sentence him with no enhancements or, in the alternative, sentence him with only the enhancements that correspond to the plea agreement and the indictment. These sentences reflect the severity of the crime committed without adding points that the Government cannot establish by a preponderance of the evidence.

Mr. Harrison accepts that he violated the law and comes now to take responsibility for his actions. Mr. Harrison prays this Court sentence him based on the conduct committed instead of the conduct the Government argues he *intended* to commit. In sentencing Mr. Harrison accordingly, the general punishment principles and Mr. Harrison's rehabilitation will be effectuated, while supporting a sentence sufficient for the crime committed, but not a sentence greater than necessary for the conduct. 18 U.S.C. § 3553(a).

In Count One of his indictment, Mr. Harrison was charged with conspiring to steal U.S. Treasury checks totaling over "$530,000." [Exhibit #3, Indictment, Docket Number 18]. Count One of the Indictment lists four checks individually totaling $1,634.57, $1,313.82, $1,216.64, and

$529,652.88. The aggregate total of these checks is $533,817.91, which rounds to the $530,000 figure in Count One. *Id*. Count Two of his indictment charges Mr. Harrison with stealing and converting three checks for his own use, with a value of more than $1,000. Count Two lists only the following checks: $1,634.57, $1,313.82, and $1,216.64, but omits the $529,652.88 check.

In Mr. Harrison's plea transcript, he pleaded guilty to and took responsibility for Count Two alone. [Exhibit #4, Memorandum of Plea Agreement, Docket Number 44]. Though the Government agreed to dismiss Count One, paragraph 5(b), on page seven of the plea transcript states that the conduct from Count One could be used as relevant conduct. The Presentence Investigation Report (PSR) tacks on over $12 million worth of loss never contemplated by Mr. Harrison during the commission of the crime. [Exhibit #5, Amended Presentence Investigation Report, Docket number 57].

The additional $12 million comes from four additional checks individually totaling $75,000, $523,266.78, $11,688,593.99, and $338,922.09. [Exhibit #5, paragraph 13]. These checks together amount to $12,589,782.86 and stand to add 20 points of sentencing enhancements. Mr. Harrison never possessed these checks and never intended to use them for financial gain. Moreover, the Government never recovered these checks and cannot prove Mr. Harrison intended to effectuate loss with them. Given the facts, the addition of these checks into Mr. Harrison's loss amount is unsupported by a preponderance of the evidence and is unreasonable.

U.S.S.G. § 2B1.1(b)(1) defines loss as "the greater of actual loss or intended loss." While actual loss is the reasonably foreseeable pecuniary harm resulting from the offense, intended loss is the pecuniary harm the defendant purposely sought to inflict. *Id*. The calculated loss must be a reasonable estimate established by the Government, based on a preponderance of the evidence. *U.S. v. Lawson*, 128 F.4th 243, 254–55 (4th Cir. 2025) *quoting U.S. v. Shephard*, 892 F.3d 666,

673 (4th Cir. 2018). This Court should find the intentional loss attributed to Mr. Harrison in the PSR is unreasonable and cannot be proved by a preponderance of the evidence.

The PSR lists eight checks totaling $13,159,600.77 as the source of Mr. Harrison's intended loss. [Exhibit #5, paragraph13]. Mr. Harrison had possession and control of only four of these checks, each with an individual value of $1,313.87, $1,634.57, $1,216.64, and $529,652.88. Of these four, only three were exchanged by Mr. Harrison for profit, with Mr. Harrison never intending to profit from the $529,652.88 check and, in fact, never exchanging it for profit. Mr. Harrison argues that he never intended to profit from the $529,652.88 check and, instead, like the other checks discussed below, intended only to use it to phish for trust and exaggerate his own capabilities regarding the three $1,000 checks.

Were this Court only to apply the total of the three checks traded for profit to sentencing, Mr. Harrison would have no sentencing increase under U.S.S.G. § 2B1.1. Therefore, Mr. Harrison personally argues that the only checks the Court should only use these three checks in calculating his total loss amount. This consideration by the Court would lead to no sentencing enhancement.

Any check added to this amount breaches into territory that is unreasonable and unsupported by a preponderance of the evidence. While Mr. Harrison had possession of the $529,652.88 check it would have been impossible to cash it. The Government can prove he had possession but cannot establish that Mr. Harrison intended to profit from the $529,652.88 check. Given the impossibility of cashing these large checks totaling $13,155,4355.74, it is unreasonable to use them against him.

The PSR points to Mr. Harrison *claiming* to have access to checks totaling $11,688,593.99, $75,000, $338,922.09, and $523,266.78. The PSR does not state that these were found in his possession because none of them were. Moreover, the only evidence supporting their existence is

screenshots of photos within text messages to an unnamed confidential informant. With the inclusion of these checks, a 12-point enhancement mutates into a 20-point sentence enhancement when Mr. Harrison never intended to profit and effectuate any loss with these checks.

The Government may point to the conversation Mr. Harrison had with the CI about whether the CI could cash these larger checks. What the Government cannot show is why Mr. Harrison was asking these questions. Throughout the interaction with the CI, Mr. Harrison was wary of the CI regarding the three checks he actually intended to be exchanged for profit. Mr. Harrison asked about these additional checks only to phish to see if he could trust the CI, not to profit from these checks. The Government may argue this proves Mr. Harrison stole the checks and they were in his possession, but with nothing more than photos that could have come from anywhere, the Government cannot support this conclusion by a greater weight of the evidence.

The PSR claims in paragraph 15 ". . . Harrison is accountable for an intended loss of $13,159,600.70 for eight *stolen* U.S. Treasury checks." The conclusion that Mr. Harrison stole these four additional checks is supported only by the assumption that Mr. Harrison was in possession of the checks. This assumption is based on text messages sent to a CI but lacks any definitive evidence of theft or proof that Mr. Harrison possessed these checks. Thus, the contention that Mr. Harrison stole these is unsupported by a greater weight of the evidence. In addition to the lack of evidence regarding Mr. Harrison's alleged theft of these checks, it is unreasonable to think it would have been possible to convert any of them to his own use.

The level of sophistication required to convert these checks to profit far exceeds Mr. Harrison's capabilities. The range of values for these checks is $75,000 to $11,688,593.99. The checks for $75,000, $338,922, $523,266.78, and $529,652.88 are impossible to cash with Mr. Harrison's lack of sophistication. Without question, he would have been unable to cash the

Page **7** of **11**

Case 5:24-cr-00250-M-RJ    Document 61    Filed 01/02/26    Page 7 of 11

$11,688,593.99 check. Mr. Harrison's reference to these checks was nothing more than posturing to achieve his sole goal: getting the smaller $1,000 checks processed.

In the audio recordings between Mr. Harrison and the CI, it is clear that Mr. Harrison lacks the knowledge, materials, and know-how to profit from these additional checks, including the $529,652.88 found on his person. The CI himself admits to the difficulty of cashing these checks and the sophistication needed for this level of loss, while almost coaching Mr. Harrison. This is the same CI whom the Government financially rewarded for his work on the case.

Taking the $11,688,593.99 check alone, it is certainly unreasonable to believe this check could successfully be cashed by someone other than the intended beneficiary, as there are no circumstances under which that loss could have occurred. The Fourth Circuit asserts that courts can reasonably include even an impossible intended loss within the total loss calculation. However, it is not just impossible to cash these checks, the greater weight of the evidence cannot establish the loss from these checks was intended by Mr. Harrison. Thus, it is unreasonable to attribute these calculations as intended loss.

In sum, out of the five larger checks being attributed to Mr. Harrison's loss amount, only one was found in Mr. Harrisons possession. Even taking away the $529,652.88 check found in his possession, the Government is attempting to add on an additional $12,625,782.86. This represents 96% of what Mr. Harrison stands to be punished for. The inclusion of these four additional checks is unsupported by a greater weight of the evidence and subjects Mr. Harrison to a punishment that is far greater than what is necessary.[1]

Mr. Harrison maintains his acceptance of responsibility, as highlighted in paragraph 15 of the PSR and in the plea agreement entered with the Government. What Mr. Harrison brings to the

---

[1] This creates a grossly disproportionate penalty unfitting for Mr. Harrison's culpability in violation of his Eighth Amendment Rights

Court's attention is the addition of checks not listed in the indictment and unsupported by a preponderance of the evidence. Had probation included only those checks referenced within the indictment, Mr. Harrison would be facing a 12-point enhancement[2]. Without the impossible-to-effectuate $11 million check alone, he faces just a 14-point enhancement[3]. However, with the addition of all of the checks that were never seized, never intended to be acted on, and impossible to act on, Mr. Harrison faces a 20-point increase. Any variation of these enhancements creates a sentence that is much greater than necessary. Therefore, the only adequate sentencing level for Mr. Harrison is his personal argument for level 6.

## CONCLUSION

Mr. Harrison faces a mountain of unreasonable sentencing enhancements based on the unsupported accusation he intended to profit from more than he actually profited from. Probation's inclusion of checks, unsupported by a preponderance of the evidence, creates a sentencing scheme that is far greater than necessary and one that exceeds the nature of the crime Mr. Harrison has taken responsibility for. Thus, Mr. Harrison personally asks to be sentenced without any enhancements, which would be a sentence congruent with the plea agreement between him and the Government. Mr. Harrison took responsibility for his actions and saved the Court and the Government time, only to then be charged with an intended loss he never intended. The sentence Mr. Harrison is requesting is derived directly from the nature of the crime and is sufficient but not greater than necessary.

---

[2] Including the following checks: $529,652.88, $75,000, $523,266.78, $338,922.09, and $11,688,593.99—Totaling $13,155,435.74
[3] Indictment checks plus those referenced in PSR without $11 Million Check: $75,000, $523,266.78, and $338,922.09—Totaling $1,471,006.78

WHEREFORE, Mr. Harrison, by and through undersigned counsel, respectfully prays this Honorable Court effectuate justice by sentencing him with no enhancements.

Respectfully submitted this the 2nd day of January 2026.

        Respectfully submitted,

        W. James Payne Law Firm
        /s/ W. James Payne
        Attorney for Defendant
        P.O. Box 2308
        Shallotte, NC 28459
        Telephone: (910) 754-4389
        E-mail: payne@jamespaynelaw.com
        State Bar No. 12512
        Appointed

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
Case Number 5:24-cr-00250-M-RJ-1

| UNITED STATES OF AMERICA | * |
| --- | --- |
| | * |
| v. | * |
| | * |
| ISAIAH ANDERSON HARRISON | * |
| Defendant | * |

CERTIFICATE OF SERVICE

    I hereby certify that on 2 January 2026, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system which will send notification of such filing to the following: Karen Haughton Esq.

                             Respectfully submitted,

                             W. James Payne Law Firm
                             /s/ W. James Payne
                             Attorney for Defendant
                             P.O. Box 2308
                             Shallotte, NC 28459
                             Telephone: (910) 754-4389
                             E-mail: payne@jamespaynelaw.com
                             State Bar No. 12512
                             Appointed