

## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF NORTH CAROLINA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | **REVISED** |
| vs. | ) | **PRESENTENCE INVESTIGATION REPORT** |
| | ) | |
| | ) | Docket No.:  0417 5:24CR00250M-001 |
| ISAIAH ANDERSON HARRISON | ) | |
| | ) | |

**Prepared for:**   The Honorable Richard E. Myers II
                    Chief United States District Judge

**Prepared by:**    J. Chris Cagle
                    Senior U.S. Probation Officer
                    Raleigh, NC
                    919-861-8800

**Assistant U.S. Attorney**
Karen K. Haughton
150 Fayetteville Street, Suite 2100
Raleigh, NC 27601
919-605-9517

**Defense Counsel**
Wayne James Payne
Post Office Box 2308
Shallotte, NC 28459
910-754-4389

**Sentence Date:**   December 9, 2025

**Offense:**   <u>Count 2</u>:
Theft of Government Property and Aiding and Abetting
18 U.S.C. § 641, 18 U.S.C. § 2
Not more than 10 years imprisonment/$250,000 fine or not more than twice the gross gain or loss from the offense
Class C Felony

**Release Status:**   Arrested and detained by federal authorities on July 31, 2024.

**Detainers:**   None known.

ISAIAH ANDERSON HARRISON
Page 2 of 15

**Identifying Data:**

| | | | |
|---|---|---|---|
| **Date of Birth:** | April 9, 1991 | **Age:** | 34 |
| **Hispanic Origin:** | Non-Hispanic origin | **Sex:** | Male |
| **SSN#:** | 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 | **Race:** | Black or African American |
| **FBI#:** | 91212MD2 | | |
| **USM#:** | 14668-104 | **Dependents:** | 0 |
| **State ID#:** | GA4060572P | **Height:** | 5ft 11in |
| **ICE#:** | None | **Weight:** | 205 |
| **Education:** | Some College | **Hair Color:** | Black |
| **Citizenship:** | U.S. Citizen | **Eye Color:** | Brown |
| **Immigration Status:** | None | | |
| **Country of Birth:** | United States | | |
| **Place of Birth:** | Brooklyn, NY | | |
| **Driver's License Number:** | GADL 054607887 | | |

**Security Threat Group:**    None.

**Alias(es):**    Also Known As: Anderson, Isaiah L; Also Known As: AndersonHarrison, Isaiah; Also Known As: Anderson-Harrison, Isaiah Leroy; Also Known As: Anderson, Isaiah; Also Known As: Anderson-Harrison, Isaiah Lero; Also Known As: Anderson, Isiah; Also Known As: Ahki

**Alternate IDs:**    Alias DOB: June 17, 1987; Alternate State ID Number: FL08405572; Alternate State ID Number: PA43471490; Alternate State ID Number: TX50445430

| **Scars/Marks/Tattoos:** | **Location:** | **Description:** |
|---|---|---|
| | Left Leg | Gunshot scar |

| **Mailing Address:** | Robeson County Jail<br>122 Legend Road<br>Lumberton, NC 28358 | **Residence Address:** | 247 West 4th Avenue<br>Roselle, NJ 07203 |

| Date First Draft Prepared: | August 18, 2025 | Date Report Revised:<br>Date Report Revised: | September 5, 2025<br>October 30, 2025 |
|---|---|---|---|

*Restrictions on Use and Redisclosure of Presentence Investigation Report* Disclosure of this presentence investigation report to the Federal Bureau of Prisons and redisclosure by the Bureau of Prisons is authorized by the United States District Court solely to assist administering the offender's prison sentence *(i.e.,* classification, designation, programming, sentence calculation, pre-release planning, escape apprehension, prison disturbance response, sentence commutation, or pardon) and other limited purposes, including deportation proceedings and federal investigations directly related to terrorists activities. If this presentence investigation report is redisclosed by the Federal Bureau of Prisons upon completion of its sentence administration function, the report must be returned to the Federal Bureau of Prisons or destroyed. It is the policy of the federal judiciary and the Department of Justice that further redisclosure of the presentence investigation report is prohibited without the consent of the sentencing judge.

## PART A. THE OFFENSE

### Charge(s) and Conviction(s)

1. **ISAIAH ANDERSON HARRISON** was named in a two-count Indictment filed in the Eastern District of North Carolina on August 27, 2024. Count 1 charged Conspiracy to Commit Offenses Against the United States from June 2024 to August 1, 2024, in violation of 18 U.S.C. § 371.

2. Count 2 charged Theft of Government Property and Aiding and Abetting on June 30, 2024, in violation of 18 U.S.C. §§ 641 and 2.

3. A Forfeiture Notice was filed.

4. On June 25, 2025, pursuant to a written Plea Agreement pursuant to Rule 11(c)(1)(A) and Rule 11(c)(1)(B), **the defendant pled guilty to Count 2 which charged conduct that concluded on June 30, 2024.** As stipulated in the Plea Agreement, the government agreed to dismiss Count 1 of the Indictment at sentencing. Both parties stipulated to the following sentencing factors based on the parties' assessment of the readily provable relevant conduct: none of the factors listed in USSG §§5K2.0 through 5K2.14 are applicable to warrant any upward or downward departure from the advisory guideline range; the conduct described in Count 1 of the Indictment is relevant conduct, pursuant to USSG §1B1.3; an upward adjustment for the possession or use of another means of identification is not warranted under USSG §2B1.1(b)(11); an upward adjustment for an aggravating role in the offense is not warranted under USSG §3B1.1; and the maximum allowable reduction for acceptance of responsibility is warranted

### Related Cases

5. None.

### Pretrial Adjustment

6. None.

### The Offense Conduct

Note: Unless otherwise indicated, the defendant did not discuss the offense conduct during the presentence process.

Background

7. In 2024, the Internal Revenue Service, Criminal Investigations (IRS-CI) commenced an investigation into a crime ring involving multiple individuals who fraudulently acquired and cashed United States (U.S.) Treasury checks in the Raleigh, North Carolina, area. A confidential informant (CI) who worked at a check cashing store in Raleigh was approached by an individual initially known as "Ahki," but later identified as **ISAIAH ANDERSON HARRISON**, who wanted to cash multiple U.S. Treasury checks. As a result, the IRS-CI opened an investigation into the U.S. Treasury checks that were in **HARRISON'S** possession.

Investigation

8. On June 24, 2024, **HARRISON** called a check cashing store in Raleigh in an attempt to form a partnership with the store's employees to process and cash stolen U.S. Treasury checks that were in **HARRISON'S** possession. **HARRISON** spoke with the CI, who worked at the store, and asked the CI if the CI could cash U.S. Treasury checks for **HARRISON**. **HARRISON** sent the CI pictures via text message of two U.S. Treasury checks in the amounts of $75,000 and $523,266.78. During a recorded phone call, **HARRISON** asked the CI, "If you can do them if they don't have all paperwork. Can you take a higher percentage? You understand what I'm saying, right?. So would you put an extra 20-25% on top or something? We can do it like 20%, 25% that would be good. You take your fee and I'll take the rest. I have people that can handle certain paperwork. But it won't be me actually using my stuff, you understand?" Agents confirmed that those U.S. Treasury checks were not issued in the name of **HARRISON** or any businesses that **HARRISON** owned or controlled.

9. Shortly after the call on June 24, 2024, the CI and **HARRISON** spoke again by phone. The CI asked **HARRISON** to provide the necessary paperwork to back up the checks. **HARRISON** agreed to provide identifications, Social Security numbers, and business documents. During the conversation, **HARRISON** asked several times if the CI could cash the checks without the required documentation. **HARRISON** stated that he had additional checks, some from prior years and others that were more recent. **HARRISON** said, among other things, "It's gonna be a lot, there's other people involved. We can run millions, it's up to you. If I didn't need no documents, I'd be there tomorrow, but because I need documents, I got to get documents made up."

10. On July 25, 2024, **HARRISON** sent the CI pictures via text message of three U.S. Treasury checks in the amounts of $11,688,593; $338,922; and $529,652.88.

11. On July 30, 2024, **HARRISON** met with the CI at the check cashing store in Raleigh. **HARRISON** provided the CI with four U.S. Treasury checks in the amounts of $1,313.82, $1,634.57, $1,216.64, and $529,652.88. The CI provided **HARRISON** with $3,000 of United States currency in exchange for the three smaller checks and promised to find a willing check casher to assist **HARRISON** in cashing the $529,652.88 check. **HARRISON** stated that he purchased those U.S. Treasury checks and that he also had an $11,000,000 U.S. Treasury check in Florida. **HARRISON** agreed to come back to the check cashing store the next day.

12. On July 31, 2024, IRS-CI agents observed **HARRISON** arrive at and exit the check cashing store. Agents received confirmation from the CI that **HARRISON** was in possession of the $529,652.88 U.S. Treasury check. IRS-CI agents and officers with the Raleigh Police Department in Raleigh conducted a traffic stop of a vehicle driven by **HARRISON**, which was also occupied by Shanice DeSilvia (unindicted), Rahmel Douglas (unindicted), and another unidentified male passenger. **HARRISON** was arrested, and a search of the vehicle revealed the $529,652.88 U.S. Treasury check, 2 iPads, 8 iPhones, a card reader, debit and credit cards with various names, various identification cards, and a small amount of marijuana. Agents determined the vehicle was registered to Monique Kizzy Tomlison (unindicted). **HARRISON** was transported to the IRS-CI office in Raleigh for questioning. **HARRISON** subsequently made an unprotected statement to the agents wherein he denied that he had any U.S. Treasury checks and claimed he had been "set up" by an unknown individual. **HARRISON** advised that he was coerced by "that guy," and **HARRISON** asked the agents how they knew that **HARRISON** was attempting to cash checks, and how the agents were tracking him. **HARRISON** stated he did not

have any information to provide the agents and instead attempted to determine how the agents knew about his involvement. **HARRISON** denied knowing anything about the U.S. Treasury check found in the trunk of the vehicle he was driving and stated he did not want to answer any questions; however, **HARRISON** continued talking with agents in an apparent attempt to determine how **HARRISON** was caught. **HARRISON** indicated he was "thrown under the bus" by an individual who "was in trouble." **HARRISON** advised that he had not been accepting checks and was not on the agent's "radar" until someone told the agent about **HARRISON**. **HARRISON** further asked if anyone else had been arrested.

13. The following chart reflects the U.S. Treasury checks that **HARRISON** texted to the CI, provided to the CI, or were seized from **HARRISON** between June 24, 2024, and July 31, 2024:

| Payor: | Payee's Initials | Date Issued | Amount |
|---|---|---|---|
| U.S. Treasury | G.S.P. | Unspecified | $75,000.00 |
| U.S. Treasury | T.P.S. | May 14, 2024 | $523,266.78 |
| U.S. Treasury | J.R. and M.T. | Unspecified | $11,688,593.99 |
| U.S. Treasury | K.B. M.C.B. | June 25, 2024 | $338,922.09 |
| U.S. Treasury | H.R. A.C. LLC | May 21, 2024 | $529,652.88 |
| U.S. Treasury | K.D. | June 28, 2024 | $1,313.82 |
| U.S. Treasury | A.B. and S.A. | June 28, 2024 | $1,634.57 |
| U.S. Treasury | A.L. | June 26, 2024 | $1,216.64 |
| Total: | | | **$13,159,600.77** |

14. IRS-CI agents examined the three U.S. Treasury checks that **HARRISON** provided to the CI, as well as the U.S. Treasury check that was seized from **HARRISON'S** vehicle. The IRS-CI agents also traced the four other checks **HARRISON** had transmitted via text message to the CI. All eight of the checks had the characteristics of U.S. government-issued Treasury checks, complete with the portrait of the Statue of Liberty and respective security watermarks. Investigation determined that the U.S. Treasury checks in **HARRISON'S** possession were generated from the filing of federal tax returns claiming tax refunds and were subsequently issued by the U.S. Treasury to individuals and/or corporations. An analysis of records related to the payees showed no connection to **HARRISON**. As of July 30, 2024, the four checks **HARRISON** had brought to the check cashing store were listed as "Issued" in the Treasury Check Verification System, which meant they were available to cash. Those checks have since been cancelled and reissued to the payees.

15. Based on the preceding, between June 2024 and July 31, 2024, **HARRISON** is accountable for an intended loss of $13,159,600.70 for eight stolen U.S. Treasury checks. No additional aggravating or mitigating factors were identified. On July 16, 2025, **HARRISON** provided a written acceptance of responsibility statement indicating he accepts responsibility for his involvement in the instant offense and is sorry for his actions

**Defendant Statements/Admissions**

16. On July 31, 2024, **HARRISON** made an unprotected statement to investigators.

### Victim Impact

17. The provisions of the Mandatory Victim Restitution Act of 1996 apply to this Title 18 offense. During the commission of the instant offense, **HARRISON** was in possession of eight stolen U.S Treasury checks totaling $13,159,600.70; however, according to the government, none of the individual victims suffered any monetary loss from the instant offense. Victim impact letters were sent to the victims who were identified by the government, and the only response received was from G.S.P. G.S.P.'S victim impact response revealed their $75,000 tax refund check was stolen and remains open receivable in their books until payment is received or compensated. They are requesting restitution in the total amount of $75,000. According to the case agent, G.S.P.'S refund check was cashed; however, there is no information indicating **HARRISON** received those funds. Additional information related to victim impact and loss is unknown and may be presented at sentencing. Pursuant to 18 U.S.C. § 3664(d)(5), the court may delay the imposition of restitution for up to 90 days after sentencing.

### Offense Behavior Not Part of Relevant Conduct

18. None.

## PART B. THE DEFENDANT'S CRIMINAL HISTORY

### Juvenile Adjudication(s)

19. None.

### Adult Criminal Conviction(s)

Note: Unless otherwise indicated, the defendant was represented by counsel or waived counsel, and the supervision/institutional adjustment record is either unavailable or no violations/infractions were noted.

| | Date of Arrest | Conviction/ Court | Date Sentence Imposed/Disposition | Guideline/ Points | |
|---|---|---|---|---|---|
| 20. | 07/06/2011 (Age 20) | Possession of Marijuana (M) 12CR3418 DeKalb County Superior Court, Decatur, GA | 02/20/2013: Conditional discharge, 12 months probation 10/28/2014: Conditional discharge completed, case dismissed | 4A1.2(e)(3) | 0 |

The offense occurred on July 6, 2011. The defendant was initially charged with Purchase, Possession, Manufacture, Distribution, or Sale of Marijuana, but pled guilty to the above-noted lesser offense. A companion charge of Possession of a Firearm or Knife During the Commission or Attempted Commission of Certain Felonies was not pursued. Additional records were requested, and a response is pending.

ISAIAH ANDERSON HARRISON
Page 7 of 15

| 21. | 02/14/2014 (Age 22) | Possession of Marijuana (M) 194550201010 Criminal Court at Law No. 11, Harris County, TX | 11/07/2014: Pled guilty 3 days custody | 4A1.1(c) | 1 |

The offense occurred on February 14, 2014.

| 22. | 05/02/2016 (Age 25) | Possession of Drug Paraphernalia (M) MJ-31105-CR-236-2016 Magisterial District Court, Allentown, PA | 07/29/2016: Pled guilty Fine and court costs | 4A1.1(c) | 1 |

On May 2, 2016, the defendant attempted to fraudulently use a credit card to make a purchase. Subsequently, law enforcement officers located marijuana and fraudulent identification and bank cards in the defendant's vehicle. The case had been transferred from Magisterial Court to the Court of Common Pleas (CP-39-CR-3903-2016), but the charge was disposed of by a lower court. A companion charge of Access Device Fraud was nolle prossed.

| 23. | 04/17/2017 (Age 26) | Access Device Fraud (F) 1:17-CR-59 U.S. District Court for the SD/AL, Mobile, AL | 07/17/2017: Pled guilty 10/16/2017: 46 months custody, 3 years supervised release, appealed 03/31/2021: Released to supervised release | 4A1.1(a) | 3 |
| | | 1:22-TP-20012-JEM U.S. District Court for the SD/FL, Miami, FL | 02/24/2022: Jurisdiction transferred to the Southern District of Florida 09/21/2023: Completed supervised release | | |

On March 27, 2014, an officer with the Saraland Police Department, Saraland, Alabama, conducted a vehicular stop of an automobile driven by Harrison. As the defendant pulled his vehicle to the shoulder of the highway, the officer observed Harrison throw a bag out of the window, which was recovered and contained marijuana. During a search of the vehicle, officers seized a computer, 30 photocopies of various driver's licenses and Social Security numbers, business EIN numbers, tax calculations, notes, and two boxes containing 60 Net Spend Visa debit cards. Subsequently, Harrison was interviewed by officers and stated he worked for a tax preparation business and that the seized items were related to his employment. When asked, Harrison was unable to provide the name or address of his employer. Companion charges of ten counts of Aggravated Identity Theft were dismissed.

Supervision Adjustment: The defendant violated the conditions of pretrial supervision by testing positive for marijuana use and failing to attend substance abuse treatment.

Institutional Adjustment: The defendant incurred five disciplinary infractions for disruptive conduct,

being in an unauthorized area, use of drugs or alcohol, possessing drugs or alcohol, and interfering with taking count.

### Criminal History Computation

24. The criminal convictions above result in a subtotal criminal history score of 5.

25. The total criminal history score is 5. According to the sentencing table in USSG Chapter 5, Part A, a criminal history score of 5 establishes a criminal history category of III.

### Other Criminal Conduct

26. None.

### Pending Charges

27. None.

### Other Arrests

28. In 2012, Harrison was charged with Possession of Marijuana (12M6115) in Cobb County, Georgia, and the charge was nolle prossed.

29. In 2013, the defendant was charged with No Seat Belt (13IF719578) in Mecklenburg County, North Carolina, and the charge was ultimately dismissed.

30. According to the 2017 PSR, in 2015, the defendant was charged with Reckless Endangerment, Act in Manner to Injure a Child Less Than Age 17, Obstruct Governmental Administration, Unlawful Fleeing Police in a Motor Vehicle, Operator Leaving the Scene of Personal Injury, and Disorderly Conduct in Kings County, New York, and prosecution was not pursued. No additional information is available.

31. In 2017, the defendant was charged with Resisting an Officer (M17010199) and Possession of a Stolen Driver's License (F17004430B) in Dade County, Florida, and the charges were nolle prossed. A charge of Possession of a Stolen Driver's License (F17004431) in Dade County was transferred into another case. Also in 2017, Harrison was charged with Credit Card Forgery (F17004434) in Miami, Florida, and no action was taken, resulting in the case being closed.

## PART C. OFFENDER CHARACTERISTICS

### Personal and Family Data

Note: The defendant's family information was verified during the pretrial investigation by his sister, Shawana Harrison, and the defendant's 2017 Presentence Report (2017 PSR), completed by the United States Probation Office in the Southern District of Alabama. Attempts to contact the defendant's brother, Emanuel Harrison, have been unsuccessful.

32. Isaiah Anderson Harrison[1] was born on April 9, 1991, in Brooklyn, New York, to the late Leroy Anderson, Jr., and the late Marguerite Harrison Anderson. Mr. Anderson was reportedly a United States Army veteran who was employed as a school bus driver prior to passing away from unspecified health issues on April 11, 1993. Mrs. Anderson was employed as a security guard before passing away from COVID-19-related health issues on April 4, 2020. The defendant advised he was the youngest of his siblings. Harrison's identified maternal half-siblings are Shawana Harrison, 45, and Khalilah Harrison, 47, both of Brooklyn, and Emanuel Harrison, 50, of Linden, New Jersey. According to the defendant, one of his paternal half-brothers, Derrick (LNU), is deceased, and he does not know any information regarding his second paternal half-brother. Harrison advised he shares a good relationship with his maternal siblings.

33. The defendant reported that he was reared in Brooklyn by his mother and late maternal grandmother, Viola Harrison. He indicated that his older siblings also assisted in caring for him. Harrison stated that although his mother struggled financially to provide for the family, he had his basic needs met the majority of the time. Harrison recalled there were occasions when their electricity service and telephone service were disconnected for late payment. Although his mother had difficulty paying their household expenses, they were never evicted. Harrison recounted his family receiving social services and financial assistance, including free lunches in school, food stamps, and Medicaid. The defendant stated his mother and grandmother both had issues with alcohol. According to Harrison, his mother was in a relationship with an individual whom he knew only as "Randy" for several years. Randy reportedly abused alcohol and also physically and mentally abused the defendant and his mother. The defendant recalled that law enforcement responded to their residence on one occasion, and Randy was removed from their home due to his actions. Harrison indicated that the physical abuse he endured from Randy resulted in marks being left on the defendant's body.

34. Harrison resided in Brooklyn until the age of 16, when he relocated for ten years to Atlanta, Georgia. At age 26, the defendant moved to Miami, Florida, where he resided for six years. Harrison returned to Brooklyn at age 33, where he has since remained. According to the defendant, he resided with his brother, Emanuel Harrison, in Brooklyn at the time of his instant offense; however, his brother has since moved to Linden. Upon his release from incarceration, Harrison plans to reside with his brother in Linden.

35. The defendant is single and has never been married. According to Harrison, he may have one minor child, but this has not been confirmed. The defendant advised that, based on his present situation, he lost contact with the child's mother, and he does not have any further information. Harrison declined to discuss any further information regarding the child or the child's mother.

**Physical Condition**

36. Harrison reportedly has dental issues and is anemic. Additionally, although never diagnosed, he has a family history of high blood pressure. According to the 2017 PSR, Harrison reported being shot in the left thigh during a home invasion in Atlanta in 2013. No further information is known.

---

[1] According to the defendant, his true name is Isaiah Leroy Anderson-Harrison.

### Mental and Emotional Health

37. The defendant reported having a history of depression during various periods in his life due to people close to him dying. Specifically, Harrison stated he struggled with periods of depression when his grandmother died. According to the defendant, he dealt with his mental health issues by self-medicating with the use of marijuana as a coping mechanism. Harrison advised that he practices the Muslim religion, wears a shemagh scarf, and prays and meditates five times daily.

### Substance Use

38. The defendant reported the following substance abuse history:

| Drug | First Used | Last Used | Addiction | Frequency of Use |
|---|---|---|---|---|
| Alcohol | Age 10 | 2024 | No | Social |
| Marijuana | Age 8 | July 31, 2024 | Yes | Daily |
| Muscle Relaxers | Age 27 | 2019 | No | Varied |
| Promethazine Codeine | Age 33 | 2024 | No | Used as a sleep aid. |

39. The 2017 PSR reflects that while on pretrial release during that case, Harrison tested positive for marijuana on four occasions. As a result, he was referred to outpatient substance abuse treatment at the direction of the United States Probation Office in Miami. The 2017 PSR reflects that he reported to the Dade Family Counseling in Miami on August 2, 2017, after missing two initial appointments. During the initial meeting, he "had a poor attitude and was resistant to participating." At that time, when asked about his need for substance abuse treatment, Harrison stated he was "not sure" if he needed treatment. No further information is known.

40. Although Harrison stated he completed the one-year Residential Drug Abuse Program (RDAP) while incarcerated in the Bureau of Prisons (BOP) in 2019, BOP records did not confirm this. According to Harrison, through counsel, he advised that he completed RDAP in 2019. However, due to the issue identified in his Institutional Adjustment in case number 1:17-CR-59, his completion was "taken away" from him. The defendant is receptive to participating in substance abuse counseling while in the BOP.

### Educational, Vocational and Special Skills

41. Harrison stated he graduated from Wheeler High School (WHS) in Marietta, Georgia, in 2009. The defendant advised he enrolled in and studied business management and accounting courses for one semester through Chattahoochee Technical College (CTC) in Marietta in 2012. Records from WHS and CTC were requested, but responses were not received. The defendant reported having marketable skills in the fundamentals of business. Records from the BOP reflect Harrison participated in the following educational courses while incarcerated in 2018: Advanced GED/Education, Health and Nutrition, Employment, Personal Finance, Community Resources, Release Requirement, and Personal Growth. Harrison is receptive to participating in educational and vocational opportunities in the BOP.

### Employment Record

Note: Unless otherwise indicated, employment records, including the reason for separation, were not available.

42. <u>July 31, 2024, to present</u>: Detained.

43. <u>2022 to 2024</u>: According to Harrison, while on supervised release, he started YMV Transport, and subsequently amended the name to YMV Investments, which was a trucking business in Miami. The defendant advised he had a truck and a driver. Records from the Florida Secretary of State's Office reflect Rocket Lawyer Corporate Services was the registered agent, and it was filed on April 20, 2021, with an effective date of January 20, 2022. The defendant was the authorized member, and the company is inactive. No further information was provided.

44. <u>2021 to 2023</u>: The defendant stated he delivered car parts for an unspecified company based in Miami, and earned $12 per hour prior to resigning. No further information is known.

45. <u>2021</u>: During Harrison's pretrial interview, he reported that he was employed for approximately three months with Wal-Mart Distribution in Alabama and earned $12 per hour. No further information is known.

46. <u>August 16, 2017, to March 31, 2021</u>: Incarcerated.

47. <u>2009 to 2017</u>: According to the 2017 PSR, the defendant reported only having "minor" jobs during this time period.

48. The defendant stated he has also worked at a carwash.

49. Records from the Social Security Administration (SSA) reflect Harrison had the following taxable earnings: $942 in 2005; $0 from 2006 to 2020; $305 in 2021; and $0 in 2022 and 2023.

### Financial Condition: Ability to Pay

50. Financial information was obtained from a personal financial statement provided by the defendant and a review of public records. Supplemental information was supplied by an independent credit source.

### Assets

| | |
|---|---|
| None | $0.00 |
| **Total Assets** | **$0.00** |

### Liabilities

| | | |
|---|---|---|
| Collection Account | T Mobile USA (charged-off) | $220.00 |
| Credit Card | American Express (charged-off) | $9,594.00 |
| Credit Card | American Express (charged-off) | $6,105.00 |
| Credit Card | American Express (charged-off) | $11,015.00 |
| Credit Card | Citi TY MC/CBNA (charged-off) | $6,618.00 |
| Credit Card | Discover Card (charged-off) | $7,499.00 |
| Credit Card | Navy Federal Credit (charged-off) | $5,194.00 |
| Collection Account | Portfolio Recovery | $5,620.00 |
| Credit Card | American Express (charged-off) | $11,720.00 |
| Credit Card | Apple Card GS Bank (charged-off) | $6,866.00 |

| | | |
|---|---|---|
| Collection Account | Portfolio Recovery | $2,571.00 |
| Personal Loans | Navy Federal Credit | $10.00 |
| Credit Card | American Express (charged-off) | $1,452.00 |
| Credit Card | Barclays Bank Delaware (charged-off) | $1,956.00 |
| **Total Liabilities** | | $76,440.00 |
| **Total Net Worth** | | ($76,440.00) |
| **Total Monthly Cash Flow** | | $0 |

51.  Based upon available information, the defendant is without the ability to satisfy a fine within the advisory guideline fine range, but is capable of satisfying a reduced fine. The fine is based upon Bureau of Prisons projections of $300 during the first 3 years of imprisonment, $43 per month during the remainder of incarceration (UNICOR employment and participation in the Inmate Responsibility Program), and the term of supervised release based upon the expectation the defendant will be employed full time, earning at least minimum wage, and therefore, capable of making a minimum monthly payment of $50. A 60-day grace period following release is allowed in order for the defendant to acquire employment. No action has been taken regarding the Forfeiture Notice.

## PART D. GUIDELINE COMPUTATIONS

### Offense Level Computations

52.  The 2025 Guidelines Manual, incorporating all guideline amendments, was used to determine the defendant's offense level. USSG §1B1.11.

### Count 2: Theft of Government Property and Aiding and Abetting

53.  **Base Offense Level:** The guideline for a violation of 18 U.S.C. § 641 is USSG §2B1.1. The base offense level is 6. USSG §2B1.1(a)(2). **6**

54.  **Specific Offense Characteristics:** If the loss was more than $9,500,000 but less than $25,000,000, increase by 20 levels. USSG §2B1.1(b)(1)(K). The defendant is accountable for an intended loss of $13,159,600.70. **+20**

55.  **Victim Related Adjustment:** None. **0**

56.  **Adjustment for Role in the Offense:** None. **0**

57.  **Adjustment for Obstruction of Justice:** None. **0**

58.  **Adjusted Offense Level (Subtotal):** **26**

59.  **Chapter Four Enhancement:** None. **0**

60.  **Acceptance of Responsibility:** The defendant has clearly demonstrated acceptance of responsibility for the offense. Accordingly, the offense level is decreased by two levels. USSG §3E1.1(a). **-2**

61. **Acceptance of Responsibility:** The defendant has assisted authorities in the investigation or prosecution of the defendant's own misconduct by timely notifying authorities of the intention to enter a plea of guilty. Accordingly, the offense level is decreased by one additional level. USSG §3E1.1(b).     **-1**

62. **Total Offense Level:**     **23**

PART E. SENTENCING OPTIONS

Custody

63. **Statutory Provisions:** The maximum term of imprisonment is 10 years. 18 U.S.C. § 641 and 18 U.S.C. § 2.

64. **Guideline Provisions:** Based upon a total offense level of 23 and a criminal history category of III, the guideline imprisonment range is 57 months to 71 months.

Impact of Plea Agreement

65. Pursuant to USSG §1B1.3, all offense behavior has been incorporated within the count(s) of conviction. Therefore, the Plea Agreement had no impact upon the guideline calculations.

66. Pursuant to the Plea Agreement, Count 1 is to be dismissed at sentencing. Had the defendant pled guilty to or been found guilty of this count, he would have been subject to an additional statutory penalty of up to 5 years.

Supervised Release

67. **Statutory Provisions:** The Court may impose a term of supervised release of not more than three years. 18 U.S.C. § 3583(b)(2).

68. **Guideline Provisions:** The Court shall conduct an individualized assessment to determine whether supervised release is required and to determine the length of the term. The Court will state on the record the reasons for imposing or not imposing a term of supervised release and the reasons for the length of any term imposed. When conducting the assessment, the Court should ensure that any term imposed falls within the statutory requirements of the offense(s) of conviction and is sufficient but not greater than necessary to address the purposes of imposing supervised release on the defendant. USSG §§5D1.1 and 5D1.2, 18 U.S.C. §§ 3553(a)(1), (a)(2)(B)-(D), (a)(4)-(7), and 3583(a)-(c).

Probation

69. **Statutory Provisions:** The defendant is eligible for not less than one nor more than five years probation because the offense is a Class C Felony. 18 U.S.C. § 3561(c)(1). One of the following must be imposed as a condition of probation unless extraordinary circumstances exist: a fine, restitution, or community service.

70. **Guideline Provisions:** Since the applicable guideline range is in Zone D of the Sentencing Table, the defendant is ineligible for probation. USSG §5B1.1, comment.(n.2).

**Fines**

71. **Statutory Provisions:** The maximum fine is $250,000 or not more than twice the gross gain or loss from the offense. 18 U.S.C. § 3571(b).

72. A special assessment of $100 is mandatory. 18 U.S.C. § 3013.

73. **Guideline Provisions:** The fine range for this offense is from $20,000 to $200,000. USSG §5E1.2(c)(3).

74. The most recent advisory from the Administrative Office of the United States Courts dated January 23, 2025, suggests that a monthly cost of $4,309.00 be used for imprisonment, $3,453.00 for residential reentry centers, and $395.00 for supervision. USSG §5E1.2(d)(7).

**Restitution**

75. **Statutory Provisions:** Pursuant to 18 U.S.C. § 3663A, restitution is mandatory; however, the amount has not yet been determined.

76. **Guideline Provisions:** Restitution shall be ordered. USSG §5E1.1.

**Denial of Federal Benefits**

77. **Statutory Provisions:** None.

78. **Guideline Provisions:** None.

## PART F. FACTORS THAT MAY WARRANT A SENTENCE OUTSIDE OF THE ADVISORY GUIDELINE SYSTEM

Note: Presentation of information in this section does not necessarily constitute a recommendation by the probation officer for a variance.

79. None.

## PART G. SPECIAL CONDITIONS OF SUPERVISION WHICH MAY BE IMPOSED

80. Based on the nature and circumstances of the instant offense, the history and characteristics of the defendant, his criminal record, his substance abuse history, his mental health history, the potential of restitution, and to adequately supervise the defendant based on the aforementioned issues, the following conditions may be imposed:

81. The defendant shall participate as directed in a program approved by the probation office for the treatment of narcotic addiction, drug dependency, or alcohol dependency which will include urinalysis testing or other drug detection measures and may require residence or participation in a residential treatment facility.

82. The defendant shall participate in a program of mental health treatment, as directed by the probation office.

83. The defendant shall submit to a search, at any time, with or without a warrant, and by any law enforcement or probation officer, of the defendant's person and any property, house, residence, vehicle, and effects upon reasonable suspicion concerning a violation of a condition of supervised release or unlawful conduct by the defendant, or by any probation officer in the lawful discharge of the officer's supervision functions.

84. The defendant must make restitution in accordance with 18 U.S.C. §§ 3663 and 3663A or any other statute authorizing a sentence of restitution.

85. Should the court order a fine, restitution, forfeiture, or notice to victims, the following conditions may be imposed:

86. The defendant shall not incur new credit charges or open additional lines of credit without approval of the probation office.

87. The defendant shall provide the probation office with access to any requested financial information.

Respectfully Submitted,

/s/ J. Chris Cagle
Senior U.S. Probation Officer

9166563 10/30/2025 12:00 PM

# REVISED
# ADDENDUM TO THE PRESENTENCE REPORT

## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF NORTH CAROLINA
## UNITED STATES V. ISAIAH ANDERSON HARRISON
## DKT. 0417 5:24CR00250M-001

### OBJECTIONS

**Factual**

1. <u>Page 2, Alternate IDs</u>: The defendant objects to the Pennsylvania and Texas licenses and identification numbers being included in the Presentence Report (PSR). The defendant contends he has never used either of those identifiers.

   <u>Probation Officer's Response</u>: The numbers identified in the PSR as Alternate State ID Number: PA43471490 and Alternate State ID Number: TX50445430 are not driver's license (DL) or identification (ID) numbers. Those numbers are State Identification (SID) numbers that are uniquely generated and assigned to a defendant after they are arrested in a particular state. In the defendant's case, Texas SID # TX50445430 was assigned to the defendant after he was arrested in Texas in 2014. Pennsylvania SID # PA43471490 was assigned to the defendant after his arrest in Pennsylvania in 2016. The defendant's SID numbers are part of his criminal record and are reflected in his National Crime Information Center (NCIC) records, which is a nationwide criminal justice database managed by the Federal Bureau of Investigation (FBI). Accordingly, this information is accurately included in the PSR, and no changes to the PSR are warranted. This objection has no impact on the defendant's advisory guideline calculations.

2. <u>Paragraph 23</u>: The defendant objects to various information that is detailed in this paragraph. The defendant contends that the conduct creating this charge occurred in March of 2017. The defendant maintains he was unaware of the indictment and was subsequently arrested on the charge during a routine traffic stop. The defendant asserts that he was not evading authorities at the time. Additionally, the defendant maintains that the pretrial release violation for testing positive for marijuana is separate and distinct from the transfer of supervised release on February 27, 2022. The defendant notes that the mention of drug or alcohol infractions stems from an incident that occurred within a halfway house. The defendant claims that the breathalyzer used was faulty and provided an incorrect reading. The defendant further stated that the incident itself stemmed from a water bottle of liquor that was found in a common room, not specifically within the defendant's personal belongings.

   <u>Probation Officer's Response</u>: According to the Indictment filed in the Southern District of Alabama (SD/AL) and the PSR completed in the SD/AL in 2017 (2017 PSR), the defendant was charged with conduct that occurred on March 27, 2014. According to the 2017 PSR, the defendant was arrested on April 17, 2017, in the Southern District of Florida, on a warrant that was issued by the SD/AL. He was subsequently released on bond on May 24, 2017. Records reflect the defendant tested positive for marijuana use on June 1, 2017; June 2, 2017; June 9, 2017; and August 3, 2017. On August 11, 2017, a violation warrant for the defendant's arrest was issued. He was subsequently arrested in Miami, Florida, on the

ISAIAH ANDERSON HARRISON
Page 2 of 4

violation warrant on August 16, 2017. On September 11, 2017, a violation hearing was held, and the defendant was ordered detained pending sentencing. The defendant was ultimately sentenced on October 16, 2017, to 46 months custody. As to the information contained in the Institutional Adjustment section for that conviction, it was obtained from records of the Bureau of Prisons (BOP) regarding disciplinary infractions incurred by the defendant. The probation officer maintains that this is an accurate representation of the defendant's records pertaining to that case, and no changes to the PSR are warranted. This objection has no impact on the defendant's advisory guideline calculations.

## Legal and Guideline Applications

3. **Paragraphs 13, 15, and 54**: The defendant objects to the finding that he should be held accountable for an intended loss of $13,159,600.77 and asserts that he should only be held accountable for the actual loss. As to the intended loss, the defendant contends that it is unreasonable to assume that, lacking proper identification, he would have been able to cash the checks for $75,000, $338,922, $523,266.78, or $529,652.88, and without question, he would have been unable to cash the $11,688,593.99 check. The defendant maintains that, at the very least, the $11,688,593.99 check should be excluded from the intended loss, as there are no circumstances under which that loss could have occurred. The defendant asserts that the intended loss should be more than $550,000 but not more than $1,500,000, corresponding to a 14-level increase. Should the court deny this objection, the defendant maintains that a downward variance would be appropriate, as the guidelines will have produced a sentence that is substantially greater than is necessary to comply with the sentencing purposes outlined in 18 U.S.C. § 3553(a).

Probation Officer's Response: Pursuant to USSG §2B1.1(b)(1)(A), loss is the greater of actual loss or intended loss. According to USSG §2B1.1(b)(1)(C)(ii), "Intended loss" (I) means the pecuniary harm that the defendant purposely sought to inflict; and (II) includes intended pecuniary harm that would have been impossible or unlikely to occur (e.g., as in a government sting operation, or an insurance fraud in which the claim exceeded the insured value). Moreover, in *U.S. v. Miller*, 316 F.3d 495 (4th Cir. 2003), the Fourth Circuit Court of Appeals held, as a matter of law, "the Guidelines permit courts to use intended loss in calculating a defendant's sentence, even if this exceeds the amount of loss actually possible, or likely to occur, as a result of the defendant's conduct." Furthermore, the Commentary to USSG §6A1.3 provides that the use of a preponderance of evidence standard is appropriate to meet due process requirements and policy concerns in resolving disputes regarding application of the guidelines to the facts of a case.

In the case-at-bar, in 2024, investigators commenced an investigation into a crime ring involving multiple individuals who fraudulently acquired and cashed United States (U.S.) Treasury checks in the Raleigh, North Carolina, area. On June 24, 2024, the defendant called a check cashing store in Raleigh in an attempt to form a partnership with the store's employees to process and cash stolen U.S. Treasury checks that were in the defendant's possession. The defendant spoke with a confidential informant (CI), who worked at the store, and asked the CI if the CI could cash U.S. Treasury checks for the defendant. The defendant sent the CI pictures via text message of two U.S. Treasury checks in the amounts of $75,000 and $523,266.78. During a phone call, the defendant asked the CI, "If you can do them if they don't have all paperwork. Can you take a higher percentage? You understand what I'm saying, right?. So would you put an extra 20-25% on top or something? We can do it like 20%, 25% that would be good. You take your fee and I'll take the rest. I have people that can handle certain paperwork. But it won't be me actually using my stuff, you understand?" Investigators subsequently confirmed that the U.S. Treasury checks were not issued in the name of the defendant or any businesses that he owned or controlled. Shortly after the call, the CI and the

defendant spoke again by phone, and the CI asked the defendant to provide the necessary paperwork to back up the checks. The defendant agreed to provide identifications, Social Security numbers, and business documents. During the conversation, the defendant asked several times if the CI could cash the checks without the required documentation. The defendant indicated that he had additional checks, some from prior years and others that were more recent. The defendant stated, "It's gonna be a lot, there's other people involved. We can run millions, it's up to you. If I didn't need no documents, I'd be there tomorrow, but because I need documents, I got to get documents made up." On July 25, 2024, the defendant sent the CI pictures via text message of three additional U.S. Treasury checks in the amounts of $11,688,593; $338,922; and $529,652.88. On July 30, 2024, the defendant met with the CI at the check cashing store in Raleigh and provided the CI with four U.S. Treasury checks in the amounts of $1,313.82, $1,634.57, $1,216.64, and $529,652.88. The CI provided Harrison with $3,000 of United States currency in exchange for the three smaller checks and promised to find a willing check casher to assist Harrison in cashing the $529,652.88 check. The defendant reported to the CI that he purchased the U.S. Treasury checks and that he also had an $11,000,000 U.S. Treasury check in Florida. The defendant agreed to return to the check cashing store the next day. On July 31, 2024, investigators conducted a traffic stop of the defendant's vehicle after he returned to and exited the check cashing store, and they recovered the $529,652.88 U.S. Treasury check. Investigators examined all eight of the U.S. Treasury checks involved, which totaled $13,159,600.77, and confirmed that they all had the characteristics of U.S. government-issued Treasury checks, complete with the portrait of the Statue of Liberty and respective security watermarks, and were generated from the filing of federal tax returns claiming tax refunds. As the preponderance of evidence suggests that the defendant intended to cash all eight of the U.S. Treasury checks, he is accountable for an intended loss of $13,159,600.77. Accordingly, no changes to the PSR are warranted.

Should the court sustain this objection alone, the resulting total offense level would be 17. A total offense level 17 and a criminal history category III produce a guideline imprisonment range of 30 to 37 months and a guideline fine range of $10,000 to $95,000. Regarding the defendant's request for a downward variance pursuant to 18 U.S.C. § 3553(a), it is at the court's discretion whether such a variance is warranted.

4. <u>Paragraphs 21 and 22</u>: The defendant objects to the inclusion in the PSR and the scoring of the convictions detailed in paragraphs 21 and 22. The defendant contends that the conviction in paragraph 21 should not be scored due to the age of the conviction, which overstates the defendant's criminal history points. The defendant also maintains that the conviction in paragraph 22 should not be scored, as it was disposed of with no jail time imposed and only a fine. The defendant asserts that it is unreasonable to use this sentence to increase the defendant's criminal history points.

<u>Probation Officer's Response</u>: Pursuant to USSG §4A1.2(a)(1), the term "prior sentence" means any sentence previously imposed upon adjudication of guilt, whether by guilty plea, trial, or plea of nolo contendere, for conduct not part of the instant offense. According to USSG §4A1.2(e)(2), any other prior sentence that was imposed within ten years of the defendant's commencement of the instant offense is counted. Under USSG §4A1.2(c), sentences for misdemeanor and petty offenses are counted, except for those identified in USSG §§4A1.2(c)(1) and (2).

Notably, investigation revealed that the defendant's conduct in the instant offense commenced in June 2024. Additionally, neither of the convictions in question is identified at USSG §§4A1.2(c)(1) or (2). As to the conviction identified in paragraph 21, the defendant pled guilty on November 7, 2014, to Possession of Marijuana and was sentenced to 3 days custody. As to the conviction in paragraph 22, the defendant pled

guilty on July 29, 2016, to Possession of Drug Paraphernalia and was sentenced to a fine and court costs. As the convictions in paragraphs 21 and 22 were both sentences that were imposed upon adjudication of guilt by guilty pleas, and their sentences both fall within the 10-year timeframe to be scored, both convictions were appropriately scored. Accordingly, no changes to the PSR are warranted.

Should the court sustain this objection alone, the defendant would have 3 criminal history points, resulting in a criminal history category II. A total offense level 23 and a criminal history category II produce a guideline imprisonment range of 51 to 63 months and a guideline fine range of $20,000 to $200,000.

Respectfully Submitted,

/s/ J. Chris Cagle
Senior U.S. Probation Officer

Approved:

/s/ Christopher Patrick Eiden
Supervising U.S. Probation Officer

9166563 10/30/2025 12:00 PM

# UNITED STATES PROBATION OFFICE
## EASTERN DISTRICT OF NORTH CAROLINA

Van R. Freeman, Jr.  
Chief U.S. Probation Officer



310 New Bern Avenue, Room 610  
Raleigh, NC 27601-1441  
Phone: 919-861-8683  
Fax: 919-861-5555

DATE: October 30, 2025  
FROM: J. Chris Cagle  
          Senior U.S. Probation Officer  
SUBJECT: Isaiah Anderson Harrison  
            Docket #: 5:24-CR-250-M-001  
            Revised Presentence Report  
TO: Honorable Richard E. Myers II  
      Chief United States District Judge

The Presentence Report, Addendum to the Presentence Report, and Sentencing Recommendation published on September 5, 2025, for the above-mentioned defendant have been revised. In accordance with the Amendments to the Sentencing Guidelines, effective November 1, 2025, the Supervised Release section in Part E was revised. Additionally, Part F was revised to remove any reference to a departure consideration. Accordingly, the Sentencing Recommendation was revised. Finally, the Addendum to the Presentence Report was revised at objection 3 to reflect the defendant's position that he should only be accountable for the actual loss and not the intended loss.

The Revised Presentence Report, Revised Addendum to the Presentence Report, and Revised Sentencing Recommendation on the above referenced defendant were published in accordance with established procedures. Copies of the Revised Presentence Report and Revised Addendum have also been disclosed to the government, defense counsel, and the defendant.

Please advise if there are any questions.

Reviewed and Approved  
/s/ Christopher Patrick Eiden  
Supervising U.S. Probation Officer

cc:  
Isaiah Anderson Harrison  
Karen K. Haughton, AUSA  
Wayne James Payne, Defense Counsel  
Deputy Clerk of Court